**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**(PENSACOLA DIVISION)**

In re:                                                                                          CASE NO.: 18-30495-KKS

JOEL CREIGHTON ADAMS, and                                         CHAPTER 7
NINA ROBERTS ADAMS

    Debtors.
_____/

UTAH POWER SYSTEMS, LLC, a
Florida Limited Liability Company

    Plaintiff,

v.                                                                                               Adv. Proc. No._____

JOEL CREIGHTON ADAMS, an
Individual, and NINA ROBERTS
ADAMS, an individual.

    Defendants.
_____/

**COMPLAINT SEEKING REVOCATION OF THE DEBTOR'S DISCHARGE**

Plaintiff UTAH POWER SYSTEMS, LLC, ("Utah Power"), files this Complaint against Defendants JOEL CREIGHTON ADAMS ("JC Adams") and NINA ROBERTS ADAMS ("N. Adams") (collectively "Defendants") objecting to their discharge pursuant 11 U.S.C. §§ 105(a) and 727, Rules 60 and 61, Federal Rules of Civil Procedure, and Rules 7001(4), 9005, and 9024, Federal Rules of Bankruptcy Procedure, and states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.    On May 22, 2018, Defendants filed a joint petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*.

1

2. This adversary proceeding arises in and relates to the case of *In re Joel Creighton Adams & Nina Roberts Adams*, Case No. 18-30495-KKS, pending in the United States Bankruptcy Court for the Northern District of Florida.

3. JC Adams was the managing member of NJJ Power Services, L.L.C. ("NJJ"), a company that inspected, refurbished, and serviced turbogenerators.

4. N. Adams[1] was a member of NJJ and had signatory privileges for NJJ's bank accounts. She also was on NJJ's payroll during the relevant time period.

5. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 727.

6. Venue of the adversary proceeding lies proper in this district pursuant to 28 U.S.C. §§ 1408, 1409.

7. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## FACTUAL ALLEGATIONS

8. Utah Power's claims against JC Adams arises from a pre-petition judgment (the Final Judgment) entered by the Eleventh Judicial Circuit in and for Miami-Dade County, Florida in the amount of $5,962,042.52, plus $14,428.80 in attorneys' fees and costs. A true and correct copy of the Final Judgment is attached hereto as Exhibit "A".

9. The basis for Utah Power's claims against JC Adams are set forth the Final Judgment and the complaint from the state court action (the "State Court Complaint"). A true and correct copy of the State Court Complaint is attached hereto as Exhibit "B".

10. Utah Power incorporates the entirety of the Final Judgment and the State Court Complaint herein.

---

[1] N. Adams is also known as Nina J. Roberts and Nina Scoles.

11.  Utah Power is in the business of selling UTC PureCycle organic rankine cycle systems ("ORCs"). ORCs are turbogenerators that capture excess heat escaping from industrial processes and other heat sources and converts it into useful mechanical and electrical energy with no emissions or additional fuel required.

12.  After acquiring several disassembled ORCs in Utah, Utah Power negotiated with JC Adams for NJJ to inspect and refurbish some of the ORCs.

13.  JC Adams represented to Utah Power that NJJ would inspect the ORCs in Utah, transport the ORCs to Florida, store the ORCs in Florida, and refurbish the ORCs in Florida to return them to working condition.

14.  JC Adams knew that neither he nor NJJ had the ability to refurbish the ORCs. Nevertheless, JC Adams falsely represented that he could refurbish the ORCs with the intention of inducing Utah Power to enter into the Agreement.

15.  On March 17, 2016, Utah Power and NJJ entered into a time and material agreement (the "Agreement") that described the scope of work for the ORC's inspection, the estimated time to complete the inspection, and the applicable payment rates for NJJ personnel.

16.  Utah Power paid NJJ $1,987,341.52 to be used for the sole purpose of paying the expenses associated with inspecting, transporting, storing, and refurbishing the ORCs.

17.  JC Adams and NJJ never transported all the ORCs to Florida.

18.  JC Adams and NJJ never refurbished the ORCs.

19.  Instead, Defendants and NJJ lined their pockets with Utah Powers' money with no intention of refurbishing the ORCs.

20. For example, JC Adams requested funds from Utah Power to be used toward refurbishing the ORCs after he no longer had access to the ORCs because NJJ had been evicted from its commercial premises where the ORCS were housed.

21. JC Adams and N. Adams executed a lease agreement with a warehouse to store the ORCs, but failed to pay rent. This resulted in their eviction and the landlord taking possession of Utah Power's property.

22. JC Adams willfully accepted payments for services that were not being performed in order to apply Utah Power's funds to other expenses.

23. Defendants willfully misappropriated the funds and converted them for their own use. Defendants withdrew hundreds of thousands of dollars, in cash, after Utah Power's payments.

24. Utah Power's payments were meant for third parties to remove, transport and store the ORCs. However, Defendants failed to pay these third parties, including the warehouse landlord and transportation companies.

25. Defendants' failures resulted in separate lawsuits and judgments against them in Utah and Florida. Their failures also resulted in Utah Power losing possession of the ORCs after the Florida landlord evicted Defendants and the Utah transportation companies placed a lien on the ORCs that remained in Utah.

26. JC Adams misappropriated the funds with felonious intent by continuing to induce Utah Power to pay for services and equipment that JC Adams never intended to perform or purchase.

27. N. Adams misappropriated the funds with felonious intent by continuing to take the funds for her own use without ever intending for the funds to be used for the refurbishment of the ORCs.

28. Utah Power delivered a written demand upon JC Adams for the return of the misappropriated funds. JC Adams did not return the money.

29. On April 19, 2017, Utah Power filed a lawsuit against JC Adams and NJJ. Specifically, Utah Power sued JC Adams and NJJ for fraud, fraudulent inducement, and civil theft, among others.

30. JC Adams was served with process the following day.

31. Because JC Adams failed to timely respond, Utah Power filed a motion for default.

32. The following day, JC Adams, NJJ, and Nina J. Roberts filed a reply denying the allegations in the State Court Complaint.[2]

33. On May 26, 2017, Utah Power moved for summary judgment as to all of its claims against JC Adams.

34. On July 10, 2017, the court granted Utah Power's motion and entered final judgment in favor of Utah Power.[3]

35. Utah Power's damages were trebled pursuant to Florida's civil theft statute (section 772.11, Fla. Stat.).

36. The court entered final judgment in the amount of $5,962,042.52, plus $14,428.80 in attorneys' fees and costs.

37. Utah Power began post-judgment proceedings seeking to satisfy its judgment.

---

[2] As non-attorneys, neither JC Adams nor N. Adams could represent NJJ in that litigation. *Southeastern Associates, Inc. v. First Georgia Bank*, 362 So. 2d 967 (Fla. 1st DCA 1978).

[3] JC Adams' fraud and intentional theft was thus litigated on the merits in the state court. *Cmty. State Bank v. Strong*, 651 F. 3d 1241, 1267-68 (11th Cir. 2011).

38. Specifically, Utah Power served JC Adams and NJJ with requests for production, and interrogatories in aid of execution. *See* ¶ 11 of the Declaration of Joshua Saval, a true and correct copy of which is attached hereto as Exhibit "C".

39. Instead of producing documents and properly responding to discovery requests, JC Adams refused to participate.

40. JC Adams engaged in a pattern of willful disobedience and disregard for the Court's authority.

41. Specifically, Utah Power was forced to obtain a writ of bodily attachment to incarcerate JC Adams on behalf of himself and NJJ, which could be purged by properly responding to all outstanding discovery. *See* Exhibit "C" at ¶ 12.

42. JC Adams represented that he could properly respond to all of Utah Power's outstanding discovery within 10-14 days after release, but the trial court found this argument disingenuous.

43. Utah Power also obtained several documents from JC Adams and N. Adams' home in early May 2018 under a writ of replevin, including various business contracts, contracts for real property, and documents relating to membership in a boat club. *See* Exhibit "C" at ¶ 16.

44. Thereafter, on May 22, 2018, JC Adams filed a petition seeking to discharge the debt owed pursuant to the Final Judgment.

45. Since JC Adams filed for bankruptcy, Utah Power continued to conduct discovery to gather more information about his and N. Adams' assets for use in this bankruptcy proceeding.

46. JC Adams, as a representative for NJJ, remained incarceration until he complied with the trial court's discovery order.

47. On June 3, 2018, JC Adams filed a petition for writ of habeaus corpus with the Third District Court of Appeal, which the Third District granted and ordered JC Adams to be released.

48. Despite representing he could respond to all outstanding discovery within 10-14 days after release, Mr. Adams failed and refused to produce any further discovery on behalf of NJJ.

49. This continuous refusal to comply with the trial court's discovery order resulted in the trial court issuing new writs of bodily attachment against JC Adams and N. Adams as representatives for NJJ.

50. On September 14, 2018, JC Adams filed another motion with the Third District asking to quash the new writs of bodily attachment. The Third District granted the motion finding the trial court needed to make specific findings that JC Adams had the present ability to purge the writ.

51. On October 1, 2018, Utah Power filed a motion for rehearing with the Third District and intends to move the trial court for another hearing on NJJ's failure to comply with the trial court's discovery order.

52. As part of discovery in aid of execution, Utah Power was able to obtain an incomplete record of Defendants' banking statements despite Defendants refusal to provide them.

53. These incomplete statements evidence that JC Adams withdrew hundreds of thousands of dollars in cash from his and NJJ's bank accounts. Mr. Adams also transferred money to N. Adams. *See* Exhibit "C" at ¶¶ 14-15.

54. Utah Power also commenced a lawsuit against Thomas J. Lang, who was JC Adams' business partner relating to the removal, storage, and refurbishment of the ORCs. *See* Exhibit "C" at ¶ 17.

55. On September 25, 2018, the trial court ruled on Utah Power's motion to compel and ordered Mr. Lang to produce relevant discovery that Utah Power believes will be relevant to this bankruptcy proceeding. *See* Exhibit "C" at ¶ 18.

56. JC Adams has another business partner, Daniel E. Bell, who contacted undersigned counsel on or about September 4, 2018 and advised that an individual named Scott Hill recently paid JC Adams $1.3 million to start a new business. *See* Exhibit "C" at ¶¶ 19-20.

57. Mr. Bell also represented that JC Adams had stolen money from Utah Power and that JC Adams had destroyed incriminating evidence against him. *See* Exhibit "C" at ¶ 21.

58. Mr. Bell agreed to meet with undersigned counsel on September 9, 2018, whereafter Utah Power intended to file Mr. Bell's statements with this Court. However, Mr. Bell's wife advised Utah Power on September 6, 2018 that Mr. Bell had to have emergency surgery due to colon cancer. *See* Exhibit "C" at ¶¶ 22-23.

59. Utah Power is working to reschedule the meeting with Mr. Bell to have his statements available for a Rule 2004 examination. *See* Exhibit "C" at ¶ 24.

60. Utah Power has also obtained audio recordings from when JC Adams was incarcerated in Okaloosa County and Miami-Dade County. *See* Exhibit "C" at ¶ 25. Importantly, JC Adams filed for bankruptcy while incarcerated and there are audio recordings of Mr. Adams discussing the bankruptcy with N. Adams that are relevant to this bankruptcy proceeding. *See* Exhibit "C" at ¶ 33.

61.     After the meeting of Creditors, Utah Power corresponded with Defendant's counsel to schedule a Rule 2004 examination. The parties anticipated conducting the examination in November or December 2018. *See* Exhibit "C" at ¶¶ 6-8.

62.     Utah Power intended to compile the discovery it obtained from the state court actions to prepare for the Rule 2004 examination regarding the Defendants' assets. *See* Exhibit "C" at ¶¶ 9-10.

63.     However, on September 24, 2018, this Court entered a discharge against the Defendants. *See* Exhibit "C" at ¶ 26.

64.     The discharge order states that some debts are not discharged, including debts that this Court has decided or will decide are not discharged. This Court may thus still determine that Utah Power's claims against the Defendants are not discharged.

65.     Utah Power did not learn of the discharge until mid-day October 11, 2018. *See* Exhibit "C" at ¶ 27. After learning about the discharge, undersigned counsel immediately determined he had not received any of the filings in this bankruptcy proceeding since July 2018. *See* Exhibit "C" at ¶ 28.

66.     Importantly, the attorney working on this bankruptcy action for Utah Power left the firm on or about July 13, 2018. *See* Exhibit "C" at ¶ 3.

67.     Shortly thereafter, the firm's paralegal who maintained the firm's tickler system was terminated for repeated errors relating to the firm's calendaring and tickler system. *See* Exhibit "C" at ¶ 3.

68. The law firm representing Utah Power then underwent a transition in September 2018 where the partners elected to dissolve the firm.[4] *See* Exhibit "C" at ¶ 4.

69. Due to the departure of the paralegal in charge of the tickler system and the attorney on record in this bankruptcy proceeding, and the firm's subsequent restructuring, there was a breakdown in the tickler system relating to this bankruptcy proceeding resulting in undersigned counsel not learning about the discharge until mid-day October 11, 2018. *See* Exhibit "C" at ¶ 29.

70. Despite the discharge occurring on September 24, 2018, Utah Power has been working diligently to acquire further information relevant to this proceeding prior to and post discharge. *See* Exhibit "C" at ¶ 30.

71. For example, on September 25, 2018, the trial court ordered Mr. Lang to provide further documents relating to his work with JC Adams and NJJ. *See* Exhibit "C" at ¶ 31.

72. Utah Power also obtained the audio recordings of the Defendants after the date of discharge, but requested these recordings on July 31, 2018. *See* Exhibit "C" at ¶ 32.

73. There are approximately 272 recordings estimating 70 or more hours of material. *See* Exhibit "C" at ¶ 32.

74. Utah Power is in the process of listening to all the recordings,[5] including those related to the Defendants filing bankruptcy, but intends to do so prior to the Rule 2004 examination to be scheduled for November or December 2018. *See* Exhibit "C" at ¶ 34

75. Relevant issues raised in the recordings include: 1) Mr. Adams stating that he intends to not include Mr. Hill or Hill Oil as creditors in the bankruptcy because he will be doing

---

[4] Utah Power is presently represented by new counsel who will be filing a notice of appearance contemporaneously with this complaint.
[5] Utah Power has listened to many hours of recordings thus far and has already discovered critical and relevant information, as detailed below.

business with them after the bankruptcy; 2) Mrs. Adams saying she is buying a new fridge, new microwave, new air conditioning unit, and a trampoline for a house in Holt, Florida that they are moving to: 3) Mrs. Adams sold or hid property that was her inheritance so that there will be no record of it; 4) Mr. Adams began work for a company named Turbine Services International, who paid the Defendants approximately $4,500.00; 5) Mrs. Adams represented she was only going to deal with her money in cash; and 6) Defendants discuss Mr. Adams owning a lot of tools. *See* Exhibit "C" at ¶ 36.

76. Notably, Defendants' bankruptcy filings do not include the above information. *See* Exhibit "C" at ¶¶ 37-42.

77. The recordings also reveal that Defendants gathered their complete bank records, but refused to provide them to Utah Power based on the belief that they would not have to provide Utah Power any further information after filing for bankruptcy. *See* Exhibit "C" at ¶449.

78. Undersigned counsel for Utah power has spoken with the Sherry Chancellor, the trustee, who represented she does not oppose Utah Power's request to revoke the Defendants' discharge.

79. This Court should therefore revoke the Defendants' discharge in order to permit Utah Power to exam Defendants about the discrepancies in their bankruptcy filings with the substantial discovery it has obtained and continues to acquire.

80. Defendants will suffer no prejudice because it is only less than 3 weeks since this Court issued the discharge[6] and the parties intended to have the Rule 2004 examination in

---

[6] A trustee or creditor is permitted to request a revocation within one year after a discharge is granted. 11 U.S.C.A. § 727(e).

November or December 2018 after Utah Power had time to complete its discovery in the state court actions by agreement of counsel for same.

## COUNT I REVOCATION OF DISCHARGE

81. Utah Power realleges the allegations contained in paragraphs 1-80.

82. Federal Rule of Bankruptcy Procedure 9024 makes the relief included in Federal Rule of Civil Procedure 60 applicable to bankruptcy proceedings. Fed. R. Bankr. Pro. 9024.

83. Rule 60 grants a party relief from a judgment or order for mistake, inadvertence, surprise, or excusable neglect. Fed. R. Civ. Pro. 60(b).

84. The Seventh Circuit and Ninth Circuit have held that a bankruptcy court has the authority to revoke or vacate a discharge through Rule 60. *Disch v. Rasmussen,* 417 F.3d 769, 779 (7th Cir. 2005) (revoking a debtor's Chapter 7 discharge under Rule 60 because the discharge resulted from a mistake); *Cisneros v. U.S.* (*In re Cisneros* ), 994 F.2d 1462, 1466 (9th Cir.1993) (revoking the debtors' Chapter 13 discharge pursuant to Rule 9024 because the discharge resulted from a mistake).

85. The Eleventh Circuit has not yet ruled on this precise issue, but three decisions from the Middle District of Florida Bankruptcy Court have cited to *Cisneros* with approval.

86. In *In re Grossot*, 205 B.R. 341 (Bankr. M.D. Fla. 1997) and *In re Almengual*, 301 B.R. 902 (Bankr. M.D. Fla. 2003), the court cited to *Cisneros* for the proposition that it had the power to review an order entered under a mistake of fact sua sponte. *Grossot*, 205 B.R. at 342-43; *Almengual*, 301 B.R. at 910.

87. *In re Gomez*, 456 B.R. 574 (Bankr. M.D. Fla. 2011) specifically concerned a debtor seeking to vacate her discharge in order to convert the Chapter 7 proceeding to a Chapter 13 case. Id. at 575. The court examined the debtor's request under section 727(d), but also cited to *Cisneros*

and *Disch* for the proposition that a bankruptcy court has the authority to revoke or vacate a discharge through Rule 9024. *Id*. at 577 fn.1. However, the court found that the debtor was not entitled to relief under Rule 9024 because her discharge was not the subject of any mistake. *Id*.

88. Here, Utah Power is seeking revocation of the discharge due to inadvertence stemming from the breakdown in the firm's tickler system, as detailed above.

89. This Court may therefore properly revoke the Defendants' discharge under Rule 9024 because the discharge was entered through mistake, inadvertence, or excusable neglect.

90. Federal Rule of Bankruptcy Procedure 9005 makes the relief included in Federal Rule of Civil Procedure 61 applicable to bankruptcy proceedings. Fed. R. Bankr. Pro. 9005.

91. Rule 61 provides that the court must disregard errors and defects that do not affect any party's substantial right. Fed. R. Civ. Pro. 61.

92. Here, the errors resulting in the Defendants' discharge of Utah Power's claim are not harmless. Rather, Utah Power's substantial right to contest the discharge of its claim has been affected. This Court may therefore properly revoke the Defendants' discharge under Rule 9005.

93. This Court also has the equitable authority under 11 U.S.C. § 105(a) to revoke the Defendants' discharge.

94. Section 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders, rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

95. The United States Supreme Court has recognized that section 105(a) grants a bankruptcy court with broad authority to take any action that is necessary or appropriate to prevent an abuse of process. *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 375 (2007).

96. Lastly, this Court has authority to revoke the Defendants' discharge under 11 U.S.C. § 727(d), which permits this Court to revoke a discharge for, among other things, when the debtor obtained the discharge through fraud or fails to include property that is the property of the estate. 11 U.S.C. § 727(d).

97. Here, Defendants' bankruptcy filings: 1) did not include Mr. Hill or Hill Oil; 2) did not include major appliances that Mrs. Adams purchased for the Defendants' home in Holt; 3) did not include any property relating to Mrs. Adams' inheritance; 4) did not include any wages or salary from Mr. Adams' business with Turbine Services International; 5) represented Defendants had $0.00 in cash; and 6) did not include any of Mr. Adams' tools.

98. Utah Power discovered these facts evidencing fraud and a failure to include property that is property of the estate after the discharge.

**WHEREFORE**, Utah Power requests that the Court revoke the Defendants' discharge, and grant all other relief that is just, equitable, and proper.

### COUNT I OBJECTION TO DISCHARGE PURSUANT TO BANKRUPTCY CODE § 523(a)(2)(A)

99. Utah Power realleges the allegations contained in paragraphs 1-80.

100. A debt is nondischargeable under Section 523(a)(2)(A) if it arises for money obtained by "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).

101. JC Adams obtained money from Utah Power by false pretenses, making false representations, and committing actual fraud upon Utah Power.

102. JC Adams knew that these representations were false when he made them. Likewise, JC Adams never intended to perform as represented.

103. JC Adams intended for Utah Power to rely upon these representations.

104. Utah Power would never have entered into the Agreement, hired JC Adams and NJJ, or paid JC Adams but for these representations.

105. Utah Power made several payments in reliance upon these representations.

106. As set forth in the Final Judgment and State Court Complaint, Utah Power suffered damages in the amount of $1,987,341.52 for payments made, and $14,429.80 in reasonable attorneys' fees and costs, as reflected in the Final Judgment.

107. JC Adams cannot have his claim discharged because the United States Bankruptcy Code prevents debtors from discharging debts arising out of willful and malicious injury by the debtor to another entity and from money obtained by actual fraud.

**WHEREFORE**, Utah Power requests that the Court deny a discharge against JC Adams for the Final Judgment, enter judgment in favor of Utah Power against JC Adams, award costs incurred in connection with the Adversary Proceedings, and granting all proper relief.

### COUNT II – OBJECTION TO DISCHARGE PURSUANT TO 11. USC. § 523(a)(6)

108. Utah Power realleges the allegations contained in paragraphs 1-80.

109. The benefit of a fresh start under the bankruptcy code is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U. S. 279, 286, 287 (1991). JC Adams is no such actor.

110. On July 10, 2017, a Florida state court conclusively determined that JC Adams violated Florida's Civil Theft Statute by stealing nearly two million dollars from Utah Power.

111. JC Adams intentionally caused willful and malicious injury to Utah Power.

112. A debt is nondischargeable under Section 523(a)(6) if it arises from "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

113. JC Adams intentionally engaged in unauthorized conduct when it misappropriated the $1,987,341.52 that Utah Power paid to JC Adams in order to perform the ORCs inspection and refurbishment.

114. JC Adams intended to harm Utah Power by misappropriating the $1,987,341.52

115. JC Adams accepted $1,987,341.52 from Utah Power that Utah Power intended to be used to pay for the inspection and refurbishment of the ORCs, but JC Adams misappropriated the $1,987,341.52 for other unauthorized expenses.

116. The $1,987,341.52 rightfully belongs to Utah Power because JC Adams did not act as promised.

117. JC Adams misappropriated the $1,987,341.52 with felonious intent by continuing to induce Utah Power to make payment for services and equipment he never intended to perform or purchase.

118. JC Adams intended to deprive Utah Power of the benefit of the $1,987,341.52 by misappropriating the $1,987,341.52 instead of using those funds for their intended purpose.

119. JC Adams acted knowingly and with the intent to permanently deprive Utah Power of its property, and appropriate it to JC Adams's own use or the use and benefit of others not entitled to it.

120. Utah Power delivered a written demand upon JC Adams for the return of the misappropriated funds.

121. JC Adams's retention of the $ 1,987,341.52 continues to harm Utah Power.

122. As set forth in the Final Judgment and State Court Complaint, Utah Power suffered damages in the amount of $5,962,042.56 for payments made, and $14,429.80 in reasonable attorneys' fees and costs, as reflected in the Final Judgment.

**WHEREFORE**, Utah Power requests that the Court deny a discharge against JC Adams for the Final Judgment, enter judgment in favor of Utah Power against JC Adams, award costs incurred in connection with the Adversary Proceedings, and granting all proper relief.

Dated: October 12, 2018

>   Respectfully submitted,
>
>   GOLDSTEIN & COMPANY
>   *Attorneys for* Utah Power Systems LLC's
>   55 Miracle Mile, Suite 310
>   Coral Gables, Florida 33134
>   Telephone: (305) 930-7200
>   Facsimile: (305) 930-7400
>   Email: jgoldtein@gattorneys.com
>   Secondary email: jsaval@gattorneys.com
>
>   By: s/Joshua Saval
>   JASON GOLDSTEIN
>   Florida Bar No.: 91113
>   JOSHUA SAVAL
>   Florida Bar No.: 112165

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018 the foregoing document was electronically filed with the Clerk of the Court using CM/ECF and served upon all counsel of record in the attached service list either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/Joshua Saval
JOSHUA SAVAL

## SERVICE LIST

Jodi Daniel Cooke, Esq.
Stichter Riedel Blain & Postler, P.A.
41 N. Jefferson Street
Suite 111
Pensacola, FL 32501
E-mail: jcooke@srbp.com
**Attorney for Debtors**

Sherry Chancellor
Law Office of Sherry F. Chancellor
619 West Chase St.
Pensacola, FL 32502
E-mail: sherry.chancellor@yahoo.com, FL50@ecfcbis.com
**Trustee**

United States Trustee
110 E. Park Avenue
Suite 128
Tallahassee, FL 32301
E-mail: USTPRegion21.TL.ECF@usdoj.gov

PRA Receivables Management, LLC
PO Box 41021
Norfolk, VA 23541
E-mail: claims@recoverycorp.com